NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

----------------------------------------------------------------x

ABDULLAH KHALIQ, GREGORY PERRY,          :
WALTER GRIGGS, TODD FLETCHER,            :
                                         :
          Plaintiffs,                    :
                                         :        Civ. No. 03-775 (DRD)
               v.                        :
                                         :
DEVON BROWN, Individually, and as Commissioner   :        OPINION
of the New Jersey Department of Corrections,     :
JAMES MCGREEVEY, et als.,                :
                                         :
          Defendants                     :
                                         :
----------------------------------------------------------------x

Abdullah Khaliq
#70743
New Jersey State Prison
Lock Bag R
Rahway, NJ 07065

          *Pro Se* Plaintiff

Gregory Perry
#204667
Toler Place
20 Toler Place
Newark, NJ 07114

          *Pro Se* Plaintiff

Walter Griggs
East Jersey State Prison
#282536
Lock Bag R
Rahway, New Jersey 07065

*Pro Se* Plaintiff

Todd Fletcher
East Jersey State Prison
#292033 SBI # 000185425C
ACSU-B Wing 3rd FLR-Cell 307
Lock Bag R
Rahway, New Jersey 07065

      *Pro Se* Plaintiff

Stephen Holtzman, Esq.
Jeffrey S. McClain, Esq.
HOLTZMAN & MCCLAIN, P.C.
Linwood Commons, Suite F-6
Linwood, New Jersey 08221

      Attorneys for Defendant David Flynt, Individually, and as hospital administrator for CMS at East Jersey State Prison

**DEBEVOISE, Senior District Judge**

      Defendant, David Flynt ("Flynt"), as Health Services Administrator at East Jersey State Prison ("EJSP") in Rahway, moves for summary judgment on *pro se* Plaintiffs', Abdullah Khaliq ("Khaliq") and Gregory Perry ("Perry") (together "Plaintiffs")[1], claims against him. Plaintiff Khaliq is currently a *pro se* detainee at EJSP, and Plaintiff Perry is currently a *pro se* parolee. Plaintiffs, as *pro se* detainees housed in the Administrative Close Segregation Unit ("ACSU") at EJSP, filed their Complaint with this Court on February 21, 2003, containing claims that their civil rights were violated. Specifically, Plaintiffs allege Flynt was deliberately indifferent to their

---

[1] Plaintiff Todd Fletcher was dismissed from this action without prejudice for failure to notify the Court of his current address and Plaintiff Walter Griggs was dismissed from this action without prejudice for his failure to comply with discovery requests.

serious medical needs[2], in violation of 42 U.S.C. § 1983.  For the reasons set forth below, Flynt's

motion for summary judgment will be granted.[3]

## I. Background

Khaliq's claims in this matter primarily relate to his 87-day stay in the ACSU, which

began on or about October 9, 2002. (Ex. B, Khaliq Dep. 22:9-13, 28:16-29:1).  Perry's claims

primarily relate to his confinement in the ACSU during September 2002 and February 2004.

Flynt, as the Health Services Administrator, does not provide direct patient care to any inmates

at EJSP.  Flynt contends that Plaintiffs have set forth no medical evidence of any physical injury

or any evidence demonstrating that his actions amounted to deliberate indifference.  Flynt

further disputes Plaintiffs' claims against him contending (1) there is no genuine issue of material

fact regarding Plaintiffs' allegations against him; (2) he did not act with "deliberate indifference"

to Plaintiffs' "serious" medical needs; (3) Plaintiffs' medical records cannot establish that he

violated Plaintiffs' right to adequate medical treatment; and (4) he cannot be vicariously liable

for any individual's wrongful acts.  Plaintiffs' allegations, to the extent that they are not based on

pure speculation, will be accepted as true.

## A. Khaliq

The three medical conditions related to Khaliq's claim are hypertension, Hepatitis C and

a back condition.  Evidence contained in the record pertains to, *inter alia*, his treatment via

---

[2] Plaintiffs' serious medical needs include, Khaliq's hypertension, Hepatitis C and back condition (sciatic nerve) and Perry's hypertension and back condition.

[3] On March 15, 2005, Khaliq filed a motion to compel discovery.  The Court notes that that motion is not relevant to the instant matter and was not directed at defendant Flynt.

doctors' examinations and prescribed courses of treatment.

1. <u>Hepatitis C and Liver Disease</u>[4]

Khaliq was seen by medical personnel at EJSP over a 9-month period regarding his Hepatitis C infection.   Prior to arriving in the ACSU, on January 27, 2002, Khaliq was examined by Dr. Scott Tran ("Dr. Tran") in the Infectious Disease / Hepatitis Chronic Care Clinic at EJSP. At the time of his visit with Dr. Tran, Khaliq was provided education counseling on the risks and benefits of treatment of Hepatitis C. (Ex. C, CMS Khaliq 258).   On March 5, 2002, Dr. Tran ordered that lab tests be performed on Khaliq.  The results of the tests showed a mild elevation in liver enzymes and triglycerides.  Dr. Tran reviewed the lab results on March 7, 2002 and decided to start Khaliq on a low fat diet and repeat liver enzymes in June of 2002. (Ex. C, CMS Khaliq 266-269).

In August 2002, Khaliq had a physical exam, and the exam was within normal limits. (Ex. C, CMS Khaliq 296-302).  During the exam, Dr. Tran informed Khaliq, for the second time, of the risks and benefits associated with treatment and a liver biopsy, as well as a prognosis without treatment of his Hepatitis C. (Ex. C, CMS Khaliq 299).  Dr. Tran's notes show that Khaliq did not wish to proceed with treatment for his Hepatitis C condition at that time.  Approximately eleven days later, Khaliq's hepatic function panel remained within normal limits. (Ex. C, CMS Khaliq 302-303).  Dr. Tran saw Khaliq again on November 20, 2002, at which time Dr. Tran again revealed to Khaliq the risks and benefits associated with the treatment of his chronic conditions. (Ex. C, CMS Khaliq 306-311).

---

[4] Khaliq's complaints about his liver disease may be related to his Hepatitis C condition, as Hepatitis C may cause liver disease or failure.

2. Hypertension

Khaliq received both Ecotrin[5] and Tenormin[6] throughout his time in the ACSU and after

his transfer to the General Population ("GP") on or about January 21, 2003 (Ex. C, CMS Khaliq

233).  When he was transferred from the GP to the ACSU, there was a brief lapse in the

administration of Khaliq's medication.  However Khaliq's Medication Administration Records

("MAR") show that he received his medication as prescribed.  Khaliq consistently received

Tenormin from June 2001 through November 2002 (Ex. C, CMS Khaliq 136, 147, 152, 154, 166,

170, 172, 181, 185, 189, 199, 206, 212, 224).  Khaliq consistently received Ecotrin and

Tenormin from December 2002 through April 2004 (Ex. C, CMS Khaliq 226, 228, 234, 239,

242, 244, 246, 248, 250, 252, 254, 366, 372, 377, 381, 392, 400). Records demonstrate that

Khaliq did not show up to pick up his medication on occasions while he was in the ACSU (Ex. C,

CMS Khaliq 218, 220), before he was transferred to the ACSU (Ex. C, CMS Khaliq 214, 172)

and after he was transferred back to the GP (Ex. C, CMS Khaliq 239).

With regards to his diet, over the course of his stay in the ACSU, Khaliq submitted a

series of administrative remedy forms regarding his low sodium diet and other medical issues.

Khaliq corresponded via letter with two Food Service Supervisors at EJSP, Randazzo and

Lockhart.  The letters were dated November 9, 2002, November 10, 2002 and December 8, 2002

and addressed his concerns regarding his low sodium diet and food provided to prisoners during

---

[5] Ecotrin is an anti-inflammatory pain medication.

[6] Tenormin, a type of medication known as a beta blocker, is used in the treatment of
high blood pressure, angina pectoris (chest pain, usually caused by lack of oxygen in the heart
muscle due to clogged arteries), and heart attack.

Ramadan.

3. <u>Back Condition</u>

Khaliq has a sciatic nerve condition.  On or about April 23, 2002, Khaliq was seen by Dr. George Long ("Dr. Long") after experiencing pain in his back (Ex. C, Khaliq CMS 277).  Dr. Long prescribed pain medication for Khaliq's "low back pain, secondary to sciatica" during the visit. (Ex. C, Khaliq CMS 280).  After being placed back in the GP, Khaliq's back pain continued and pain medication was included as part of his treatment plan. (Ex. C, Khaliq CMS 318-320).

B. <u>Perry</u>

The two medical conditions related to Perry's claim are hypertension and a back condition.[7]  Evidence contained in the record pertains to, *inter alia*, his doctors' examinations and prescribed courses of treatment.

1. <u>Hypertension</u>

Perry was admitted to the ACSU on or about September 17, 2002. (Ex. D, CMS Perry 78).  Upon entry, Perry was seen by Registered Nurse ("RN") Shehata.  At that time, Perry requested a low salt diet and the doctor was notified of his request.  Perry began receiving his special diet within 10 days of being transferred to the ACSU, and he received that diet for the remainder of his time there. (Ex. E, Perry Dep. 30:24-31:17).

2. <u>Mental Health</u>

---

[7] Perry also went through a series of mental health examinations related to his cell assignment.  During the time frame for his claim in this matter, medical and social work staff noted no mental health concerns.

6

On September 17, 2002, Perry was seen by RN Prestien regarding a transfer assessment. RN Prestien noted no complaints with Perry appearing stable.  There were no complaints recorded by the nursing staff between September 18, 2002 and December 31, 2002. (Ex. D, CMS 79). Perry had never been treated for psychiatric problems in the past, was never placed on the Special Needs Roster and never received mental health treatment.

On October 8, 2002, Dr. Miller reported that Perry had no acute psychopathology, was not receiving any psychotropic medications and did not have impulsive and violent behavior. The chart note shows that a past psychological report reveals that Perry has a sociopathic character structure. (Ex. D, CMS Perry 131-132).  Perry took a principled stand with respect to double celling but Dr. Miller concluded that Perry's desire for a single cell "is based on meeting his own needs and not based upon his suffering from a major mental illness". (Ex. D, CMS Perry 131-132; Ex E, Perry Dep. 54:1-55:9).

In 2002, Perry met with a licensed social worker on October 14, October 25, November 12, December 10, December 17, December 24, and December 31.  In 2003, Perry met with a licensed social worker on January 9, January 17, January 24, January 31, September 2 and November 3.  During the aforementioned thirteen visits, no mental health concerns or evidence of decompression, anxiety or agitation were noted. (Ex. D, CMS Perry 200-202, 199-200, 197-198, 194-196, 192-194, 187-191, 181-184).

On March 20, 2003, Perry was seen by psychiatrist Dr. Feinbach regarding his mental health, and at that time Perry had no complaints and Dr. Feinbach found no decompensation due to Perry's stay in the ACSU. (Ex. D, CMS Perry 185-186).  Perry made no complaints during 2003 or during January of 2004.  (Ex. D, CMS Perry 91A, 158).  He was transferred to Northern

State Prison on January 31, 2004. (Ex. D, CMS Perry 180-181).

3. <u>Back Condition</u>

On or about October 22, 2002, Perry complained of chronic lower back pain and a nurse referred him to the doctor. (Ex. D, CMS Perry 80). Perry suffered a fall on the stairs in the ACSU unit on November 20, 2002, after which a member of the medical department came to the ACSU, evaluated him, prescribed tests and administered an injection and other medication. (Ex. E, Perry Dep. 55:10-63:9). When Perry was examined by Dr. Tran after his fall, he complained of left sided lower back pain. (Ex. D, CMS Perry 133-138). Dr. Tran noted that the physical exam he conducted was unremarkable, the spine showing normal alignment and mobility with no deformity, Perry's straight leg raise being negative, no reported tenderness over the left posterior portion of the pelvic bone, no evidence of hip dislocation, and a good range of motion and strength. (Ex. D, CMS Perry 133-138). Dr. Tran diagnosed musculo-skeletal pain and spasm. Perry was given a shot of Toradol[8] and a prescription of Motrin[9] and Robaxin[10]. Restrictions on work and recreation were prescribed for Perry and Perry was given a ground floor room assignment with a lower bunk. Perry refused to be admitted to the infirmary for further observation. (Ex. D, CMS Perry 138).

On November 21, 2002, Perry had cervical, pelvic, lumbar and shoulder x-rays. (Ex. D,

---

[8] Toradol is a nonsteroidal anti-inflammatory drug used to relieve moderately severe, acute pain.

[9] Motrin is a nonsteroidal anti-inflammatory drug used for relief of mild to moderate pain.

[10] Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains.

CMS Perry 82-85).  The cervical x-ray showed no significant abnormality and the pelvic and left shoulder x-rays were both within normal limits.  The lumbar x-ray showed degenerative joint disease and the Sacroiliac joint was unremarkable. (Ex. D, CMS Perry 82-85).

Perry submitted Health Services Request forms to get refills of his medications on different occasions, including in November 2002, December 2002 and February 2003.  Perry's Medication Administration Records ("MAR") show that he received his medication as prescribed in November 2002 (Robaxin, Motrin and Toradol) (Ex. D, CMS 87-88), December 2002 (Parafon Forte[11], Motrin and analgesic balm) (Ex. D, CMS 90-91), January 2003 (Parafon Forte and Motrin) (Ex. D, CMS 93-94), February 2003 (Motrin) (Ex. D, CMS 97-98), March 2003 (Motrin and Parafon Forte) (Ex. D, CMS 100-101), April 2003 (Motrin) (Ex. D, CMS 102-103), May 2003 (Motrin) (Ex. D, CMS 211-212), and June 2003 (Motrin) (Ex. D, CMS 106-107).  Perry was provided a back brace in January and March 2003.

The record shows that Perry was examined regarding his lower back pain on different occasions, including December 9, 2002, March 10, 2003 and May 9, 2003 (Ex. D, CMS 149-150).  During these examinations, Perry denied radiation of pain, numbness, tingling and had a negative strain raise, full range of motion existed and his physical exams were unremarkable. (Ex. D, CMS Perry 139-142).

On April 27, 2003, because of his back problems, Dr. Kapchits entered an order for Perry to be housed on the ground floor only. (Ex. D, CMS Perry 148).  Perry testified that in May 2003

---

[11] Parafon Forte DSC is prescribed, along with rest and physical therapy, for the relief of discomfort associated with severe, painful muscle spasms.  When Robaxin was discontinued, Perry was prescribed Parafon Forte in its place.

his medication was not refilled and his order for ground floor housing was not renewed by a female doctor. (Ex. E, Perry Dep. 67:4-68:18). Perry stated that his complaints in this matter are related to the treatment by the female doctor in May 2003. (Ex. E, Perry Dep. 99:1-25). Perry stated that because he was transferred to the third floor of the ACSU, he suffered there because he had to walk up and down the stairs once a week. (Ex. E, Perry Dep. 70:1-9, 70:21-72:1).

## II. Discussion

### A. Summary Judgment Standard

A motion for summary judgment will be granted if after drawing all inferences in favor of the moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c); *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 631 (3d Cir. 1998)*; Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Davis v. Portline Transportes Maritime Int'l*, 16 F.3d 532, 536 n. 3 (3d Cir. 1994); *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue may exist if the record taken as a whole could lead a rational trier of fact to find for the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under Fed. R. Civ. P. 56(c), the moving party bears the burden of pointing out to the district court an absence of evidence to support the nonmoving party's case. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986).  The court will take the nonmoving party's allegations of fact

as true. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).  If the moving party

meets its burden, the opposition bears the burden of "set[ting] forth specific facts showing that

there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

B. <u>1983 liability of prison authorities for violation of federal constitutional or statutory rights.</u>

At the core of this litigation are Plaintiffs' § 1983 actions.  To establish a claim under §

1983, a plaintiff must show a violation of a constitutional right or federal law, committed by an

individual acting under the color of state law. *Natale v. Camden County Corr. Facility*, 318 F.3d

575, 580-581 (3d Cir. 2003).  In this case, the Constitutional rights alleged to be violated are the

right to be free of cruel and unusual punishment under the Eighth Amendment.  The Eighth

Amendment to the United States Constitution states: "Excessive bail shall not be required, nor

excessive fines imposed, nor cruel and unusual punishments inflicted."

"An Eighth Amendment claim against a prison official must meet two requirements: (1)

'the deprivation alleged must be, objectively, sufficiently serious'; and (2) the 'prison official must

have a sufficiently culpable state of mind'." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir.

2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "A prison official cannot be found

liable under the Eighth Amendment for denying an inmate humane conditions of confinement

unless the official knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference," and "[t]he Eighth Amendment does

not outlaw cruel and unusual conditions; it outlaws cruel and unusual punishments." *Farmer v.

Brennan*, 511 U.S. at 837.  Under the Eighth Amendment, prison officials have a duty to provide

11

humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care, and must protect prisoners from violence at the hands of other prisoners. *Id*. at 825. "Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety". *Id*. at 844 (internal quotations omitted). However, prison authorities have considerable latitude in the diagnosis and treatment of prisoners, *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993); *Jackson v. Fauver*, 334 F.Supp.2d 697, 716 (D.N.J. 2004), and "[p]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause". *Farmer v. Brennan*, 511 U.S. at 845.

C. Principles governing when inadequate medical care rises to the level of cruel and unusual punishment

Prison systems have a duty to provide prisoners with adequate medical care, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and "[t]he Eighth Amendment proscribes deliberate indifference to prisoners' serious medical needs." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004); *Natale v. Camden County Corr. Facility*, 318 F.3d at 582. To establish a violation of his or her Eighth Amendment right to adequate medical care, an inmate "must show (I) a serious medical need, and (ii) acts or omissions by prison officials that indicated deliberate indifference to that need." *Id.*; *Jackson v. Fauver*, 334 F.Supp.2d at 706. A serious medical need is a need diagnosed by a physician, that the physician believes to require medical treatment, or a need that is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Fauver*, 334 F.Supp.2d at 706 (quoting *Monmouth County Corr. Inst. Inmates v. Lanzaro*,

834 F.2d 326, 347 (3d Cir. 1987)).

Finding a prison official was deliberately indifferent requires a showing that the official "knew of and disregarded an excessive risk to [the] inmate['s] health." *Natale v. Camden County Corr. Facility*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. at 837).  A plaintiff must "present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm". *Beers-Capitol v. Whetzel*, 256 F.3d at 132; *Heggenmiller v. Edna Mahan Corr. Inst. for Women,* 2005 WL 826070, slip copy at 1 (3d Cir. 2005).  Deliberate indifference has been found in situations where "necessary medical treatment is delayed for non-medical reasons," or where objective evidence established that a prisoner had a serious need for medical care and the official ignored the that evidence. *Natale v. Camden*, 318 F.3d at 582 (citations omitted).  Allegations of negligence, medical malpractice and mere disagreement as to the proper medical treatment are not sufficient to establish an Eighth Amendment violation. *Jackson v. Fauver*, 334 F.Supp.2d at 706, 710; *Spruill v. Gillis*, 372 F.3d at 235; *Durmer v. O'Carroll*, 991 F.2d at 67.

D.  The medical treatment of Plaintiffs does not rise to the level of a Constitutional violation

To determine that Plaintiffs' Eighth Amendment claims survive a motion for summary judgment, this Court must find that a reasonable jury could hold that: (1) Plaintiffs' medical problems were serious, and (2) Flynt was deliberately indifferent to those medical problems. "In evaluating a claim for deliberate indifference to an inmates medical needs, a court should consider the severity of the inmate's medical problems, and the potential for harm if the medical care is denied or delayed. A court may also consider the actual harm that resulted from the defendant's alleged indifference to the plaintiff's serious medical needs." *Jackson v. Fauver*, 334

F.Supp.2d at 713.

In support of his claim he has produced documents, his own testimony and also an August 14, 2002 report of Robert B. Greifinger, M.D.  The report is highly critical of the overall medical care provided at EJSP.  In particular he was critical of record keeping, failure to respond to complaints in a timely manner, delays in referring cases requiring special care, failure to provide required medication and to respond to physician requests for preauthorization, all of which, according to Dr. Greifinger were known to CMS, which is under contract to provide medical care, and to the Department of Corrections at the level of correctional officer, administrator and assistant administrator at local levels and to the Department of Corrections officials in their central office.

Dr. Greifinger cited a number of cases where the treatment of severe medical conditions was so deficient it could well constitute deliberate indifference to a serious medical need. According to him these deficiencies "have led to unnecessary pain and preventable deterioration of function.  In some cases they have led to permanent disability and high risk of premature death." This was a result, Dr. Greifinger concluded, of CMS's placing its profits ahead of proper medical care.  The only thing this denied access to specialty care and medication accomplished was direct cost savings to CMS and, indirectly in the form of lower contract price, cost savings to the State.

Dr. Greifinger noted lapses in Khaliq's treatment for hypertension but noted no adverse consequences flowing from such lapses.  The report might support a claim of negligence on Khaliq's part; it does not constitute evidence of medical treatment so deficient as to constitute an Eighth Amendment violation.  It does not appear that Perry is mentioned in Dr. Greifinger's

report.

In opposition to Flynt's motion, Khaliq contends that Plaintiffs 1) did not receive prescribed medication for long periods of time, 2) were not taken for consultations in a timely manner, and 3) were unable to receive timely responses to their basic medical complaints and concerns (Khaliq Brief at 1). In this case, the evidence contained in the record could not support a finding of medical treatment so inadequate as to support an Eighth Amendment violation. Plaintiffs have suffered no lifelong hardships or disabilities, and there is no evidence of actual harm that resulted from any of Flynt's actions. In addition, there was no serious medical need in most instances, and to the extent that there was a serious medical need, there was no deliberate indifference.

1. <u>Khaliq</u>

Khaliq puts forth a number of claims in this matter related to his stay in the ACSU. He contends that 1) his remedy forms were never responded to with respect to complaints of liver disease and high blood pressure (Ex. B, Khaliq Dep. 28:16-29:12), and 2) that he was not receiving his prescription medication.

i. <u>Remedy Forms</u>

Khaliq submitted a series of administrative forms while in the ACSU. He contends that those remedy forms were not responded to. Khaliq's first request for administrative remedy was submitted on October 12, 2002 (Khaliq Ex. E). The request stated that Khaliq had not received a low sodium vegetarian diet and had not seen a doctor regarding his sciatic nerve and back condition which required pain medication. (Ex. B, Khaliq Dep. 31:19-32:7). Khaliq received a response approximately one month later on November 13, 2002 stating that Khaliq was receiving

15

his low sodium vegetarian diet. (Khaliq Ex. E; Ex. B, Khaliq Dep. 32:13-17).  Khaliq also submitted an administrative remedy form on October 17, 2002 stating that he had not received his hypertension medication or aspirin for his heart.  The form also notes Khaliq's request for a single cell due to weakness in his feet.  Khaliq received a response to that form approximately 30 days later, noting that Khaliq refused medication on November 8, 2002. (Khaliq Ex. F; Ex. B, Khaliq Dep. 33:6-14).  On October 29, 2002, Khaliq submitted a third administrative form stating that he hadn't received his hypertension medication for three weeks and wasn't receiving his low sodium vegetarian diet since being moved to the ACSU.  On November 4, 2002, a fourth administrative remedy form bearing complaints about his diet was submitted.  Khaliq received responses to the third and fourth forms on December 6, 2002.  The responses noted that Khaliq's diet problem had been corrected and that there was no expired medication order found in his chart regrading hypertension medication. (Khaliq Ex. G; Ex. B. 33:23-34:7).

Based on evidence contained in the record, it is clear that Khaliq's remedy forms were responded to and no reasonable jury could find that Flynt failed to respond to Khaliq's administrative remedy forms, thereby equating to deliberate indifference.

ii. <u>Hypertension Medication</u>

Khaliq has based his claim in part on an allegation that he was not given appropriate medical treatment in the form of prescription medication.  According to Khaliq's own testimony, at some point he received his medication while in the ACSU and continued to receive it throughout his stay there. (Ex. B, Khaliq Dep. 25:8).  In fact Khaliq received Ecotrin and Tenormin in October  2002, November 2002 and December 2002. (Ex. C, CMS Khaliq 226).  Khaliq's medical records show that he failed to appear in October 2002 in order to receive his 30

day supply of Tenormin. (Ex. C, CMS Khaliq 218).  There were multiple other occasions that

Khaliq failed to appear to receive his medication. (Ex. C, CMS Khaliq 218, 220, 214, 172, 239).

Khaliq's failure to appear before medical officials in order to receive his prescription medication is

not demonstrative of Flynt's indifference to Khaliq's medical conditions.

As stated above, the Court may consider any actual harm that resulted from Flynt's

alleged indifference to Khaliq's serious medical needs.  It must be noted that Khaliq never

testified that he suffered any physical injuries as a result of not receiving his medication.  Upon

Khaliq's transfer to the ACSU, there was a brief lapse in the administration of his medication.

The lapse in medication was acknowledged by Flynt in an October 31, 2002 inter-office

memorandum (Flynt A/I 10) and in a November 1, 2002 letter that states:

> ...[Khaliq] was transferred from Main to ACSU on 10-8-02 but somehow he
> bypassed the required medical intake process.  Therefore, there was no chart
> review or transfer examination completed and the need for medication went
> undetected.
> ...this oversight was detected when the Chronic Care Clinic lines were being
> scheduled for November...nursing advised me that the patient was interviewed as
> to why he had not mentioned it to them during routine Segregation Rounds and
> he had no reply. (Flynt A/I 10).

Medical testimony reveals that Flynt was not injured as a result of the error.  Dr. John Heydt

("Dr. Heydt"), Health Services Administrator of the medical unit, opined that "the brief lapse in

medication was corrected by Mr. Flynt in a timely manner and caused no injury to Mr. Khaliq."

(Flynt Brief at 11; Ex. G, pp. 2-3).  Dr. Heydt went on to state, "the lapse of medications...

resulted in no harm either immediate or long term.  Mr. Khaliq is not at any increased risk for

heart disease, kidney disease or stroke from not having the medication for a short duration of

time." (Flynt Brief at 12; Ex. G, pp. 2-3).  Any lapse in medication may be disturbing, and it may

be disturbing that a prisoner bypassed the required medical intake process.  However, Khaliq has

failed to show how he was injured by the lapse or the inadvertent bypass.  Khaliq has testified

that he has not suffered any residuals as a result of not getting medication and that he does not

know if Flynt intended to harm him or when Flynt became aware of his complaints.

With respect to his diet, Khaliq attaches Exhibit E to his brief, including copies of

correspondence to Food Service Supervisors, Randazzo and Lockhart.  Of the three letters

written, only the December 8, 2002 letter mentions Khaliq's hypertension and need for a low

sodium diet.  The other letters primarily focus on Ramadan and the diet provided to prisoners

during that religious time.  The letters, for the most part are not related to this action.  Khaliq

contends that his complaints about his meals were ignored.  However, as evidenced by his own

submission, his complaints were addressed to a Food Service Assistant Supervisor and a Food

Service Supervisor (Khaliq Ex. E).  Again, the Court notes that Flynt was the Health Services

Administrator and the medical department was responsible for prescribing Khaliq's diet, but was

not responsible for providing the food to him. (Ex. F).  On February 25, 2003, Khaliq sent a letter

to Flynt regarding his low sodium diet.  However Khaliq was no longer in the ACSU when he

sent that letter. (Ex. B, Khaliq Dep. 39:9-21).  No reasonable jury could find that Flynt did not

provide Khaliq with his prescribed low sodium diet, as Flynt was not responsible for getting the

actual food to Khaliq.

Khaliq's claim that he did not receive his hypertension medication for a brief period of

time, a mistake Flynt acknowledges, and one that Flynt corrected immediately upon being

notified of the problem, is not sufficient to establish an Eighth Amendment violation.  This court

has found that a failure to monitor an inmate's hypertension for a period of three years, even if an

18

indication of negligence or medical malpractice, is not sufficient to establish an Eighth Amendment violation. *Jackson v. Fauver*, 334 F.Supp.2d at 717.  In this case, the lapse of time was only between ten and thirty days (Ex. G, p. 2-3), certainly not sufficient to establish an Eighth Amendment violation.  No reasonable jury could find that Khaliq was denied medical treatment for any of his medical needs.

iii. <u>Hepatitis C and Liver Disease</u>

Khaliq claims he has not been offered nor has he declined treatment for his Hepatitis C. (Ex. B, Khaliq Dep. 41:4-15).  However, notes from Khaliq's treating physician, Dr. Tran, demonstrate that Khaliq was provided education and counseling on the risks and benefits of Hepatitis C. (Ex. C, CMS Khaliq 258).  The notes also show that Khaliq would think about whether or not he would have Hepatitis C treatment and include a written plan to treat Khaliq's condition. (Ex. C, CMS Khaliq 259-260, 269).  This evidence contained in the record proves that Khaliq did not wish to proceed with treatment for his Hepatitis C. (Ex. C, CMS Khaliq 299). No reasonable jury could conclude that Khaliq was denied education or treatment for his Hepatitis C condition.

Khaliq also claims that he was not treated for his liver disease. (Ex. B, Khaliq Dep. 28:23-29:1).  The Court previously noted that there is a connection between Hepatitis C and liver disease.  Khaliq's medical records clearly demonstrate that Khaliq was examined and lab tests were performed.  The records further show that upon receipt of the lab results, Khaliq's treating physician planned to start Khaliq on a low fat diet in an effort to decrease the elevation in his liver enzymes and triglycerides.

It is clear that throughout his time in the ACSU, Khaliq was repeatedly informed of the

risks and benefits of the treatment of his conditions, including those associated with him having a liver biopsy. Khaliq repeatedly denied treatment, though he was educated about the seriousness of his condition. Given the facts contained in the record, no reasonable jury could find that Flynt was deliberately indifferent to Khaliq's Hepatitis C or liver disease.

iv. <u>Back Condition</u>

There is no evidence contained in the record to support a conclusion that Khaliq was not treated for his back condition. In fact, the record shows the contrary. Dr. Long treated Khaliq's condition, with pain medication being part of Khaliq's treatment plan. The records clearly show that Khaliq received pain medication after the diagnosis of his sciatic nerve condition.

v. <u>Eighth Amendment</u>

A reasonable jury could not find that Flynt was deliberately indifferent to Khaliq's medical needs. Were there a finding that Khaliq's hypertension or Hepatitis C rose to the level of being a "serious" medical need, there is not a shred of evidence proving that Flynt was deliberately indifferent to these medical needs. Khaliq was monitored and examined for both conditions. He was consistently offered education and treatment and provided medication for of his medical conditions. Khaliq's Eighth Amendment claims with regard to the medical treatment he received are without merit.

Khaliq's claims in another case, *Jackson v. Fauver*, 334 F.Supp.2d 697 (D.N.J. 2004), were dismissed on September 29, 2004.[12] Khaliq includes as an attachment to his brief, Exhibit A

---

[12] In *Jackson v. Fauver*, 334 F.Supp.2d, Khaliq was one of 15 inmates at EJSP who brought separate actions against Correctional Medical Services and some of its officials and employees of the New Jersey Department of Corrections.

containing the August 14, 2002 expert report of Robert B. Greifinger, M.D., referred to above.

Portions of the report comment on Khaliq's medical condition and/or treatment (Greifinger

Report pp. 12, 13, 23).  The court in *Jackson v. Fauver*, 334 F.Supp.2d 697 addressed the report of

Dr. Greifinger in its opinion, *Id.* at 722-723, stating, "Plaintiff's medical expert notes that the part

of Khaliq's medical records that are available, for the period of 1997 to 2000, are largely illegible"

and "[Khaliq] does not dispute Defendants' claim that his blood pressure was generally kept

within medically recommended levels. It is well settled that a prisoner's subjective dissatisfaction

with his medical care does not, by itself, indicate medical indifference". *Id.* at 722-723.  Dr.

Greifinger's report states in relevant part:

> Mr. Khaliq has hypertension.  He complains of improper chronic care and long
> interruptions in his medication.  His medical record is mostly illegible for the
> period 1997-2000 and highly incomplete.  There are few medication
> administration records for the period of 1997-2000 and very few physician or
> nurse practitioner visits.  He waited one year for an electrocardiogram and three
> years for eyeglasses.  He did not have his blood pressure measured for more than
> two years.  Findings: ...The consequences of under-treated hypertension is end-
> organ failure of the heart and kidneys, along with strokes. If Mr. Khaliq's blood
> pressure was not in control, he was at risk for these conditions."(Report at 12-13).

Dr. Greifinger also stated that there was inadequate responsiveness to Khaliq's signs and

symptoms: "Mr. Khaliq testifies that he missed medication and had sporadic care for his

hypertension.  His records affirm this.  He is at unnecessary risk for end-organ damage to his

brain, heart and kidneys as a consequence." (Greifinger Report at 23).  Khaliq's claims were

dismissed in *Jackson v. Fauver* on a summary judgment motion.  The Court also notes that this

report was written in August 2002, months before the time period pertinent to Khaliq's claims  in

this case.

Much of Khaliq's brief lays out his opinion about the ways that other prisoners were

treated or his belief that the general conditions of the prison are not adequate.  Khaliq's October 24, 2002 letter addressed to Devon Brown, Commissioner of the New Jersey Department of Corrections, addressed general conditions in the ACSU along with Khaliq's specific concerns about his hypertension, low sodium diet, and sciatic nerve condition (Khaliq Ex. C).  On this motion, the court is not addressing Khaliq's concerns about the general conditions in the ACSU. Flynt's motion for summary judgment against Khaliq will be granted.

2. <u>Perry</u>

The Court notes that Perry has not opposed Flynt's motion for summary judgment, but it will discuss the relevant evidence contained in the record.

By review of the Complaint and Perry's deposition testimony, Perry's claims in the instant matter relate to: 1) his diet while in the ACSU and 2) the treatment he received by a female doctor while being housed in the ACSU.  Perry seeks no monetary damages, rather he wants to improve the conditions for inmates that will be placed in the ACSU.

Flynt was never advised of any problems that Perry had or of any complaints that Perry made.  In fact, with respect to Perry's back problems, Perry received immediate, frequent and continuous care for his injury, in the form of medications, analgesic balm, back brace and restrictions as prescribed. (Ex. E, Perry Dep. 63:10-66:3).  When Perry complained of lower back pain on October 22, 2002, he was referred to a doctor.  In fact, Perry has no complaints with respect to the medical treatment that he received on November 20, 2002 after his fall in the ACSU. (Ex E, Perry Dep. 64:24-65:3).  Perry complains that in May 2003, his medication was not refilled and his order for ground floor housing was not renewed by a doctor.  The crux of Perry's complaint is that as a result of being transferred to the third floor, he *suffered* because he

22

had to walk up and down the steps approximately once a week.  There is no evidence contained in the record demonstrating any way in which Perry *suffered* medically as a result of having to walk to the third floor once a week.

With respect to Perry's diet, it appears that Perry's complaints about his diet are based in whole on the fact that upon receiving his low sodium diet, the food was not appetizing.

With respect to Perry's mental health, no mental health concerns were ever noted by any social worker or doctor who examined Perry.  This evidence too cannot be disputed.

There is no evidence contained in the record that could lead a reasonable jury to find that Perry was not treated for his medical conditions.  Flynt's motion for summary judgment against Perry will be granted.

### III. Conclusion

Plaintiffs have not presented sufficient evidence to survive Flynt's motion for summary judgment.  No reasonable jury could infer that Flynt was deliberately indifferent to Plaintiffs' alleged serious medical needs.  As a result, it is unnecessary for the Court to consider Flynt's argument that if there was evidence of deliberate indifference to serious medical needs he could not be held personally liable.  For the reasons set forth above, Flynt's motion for summary judgment will be granted.

/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: May 20, 2005

23